DUNN *v.* STRATTON *et al.*

(Division B.  March 23, 1931.)

[133 So. 140.  No. 29305.]

(1)

H. B. Everitt, of Pascagoula, and Jas. F. Galloway, of Gulfport, for appellant.

Mize, Mize & Thompson, Gaston H. Hewes, W. T. Moore, Jr., and J. L. Taylor, all of Gulfport, for appellees.

Griffith, J., delivered the opinion of the court.

This is a suit in equity to settle a disputed boundary between adjoining owners of lots, in Harrison county, fronting on the Gulf of Mexico. The lots are a part of what is known as lot 50 of the Henderson, Shipman and Hughes partition, made in 1843. This partition was laid out under and in accordance with the original government survey and plat of 1822, by which the township was surveyed and platted into regular sections, and wherein the said lot 50 and the land herein dispute was a part of section 21, township 8 S., R. 12 W. Later and in 1849, practically all the water front in this township was

resurveyed into the Bartholomew Pellerin claim, and was finally platted by the government in such manner that all these lands were designated as section 22.

There is, however, upon the new township plat made in 1849, a small triangular or wedge-shaped piece of land running over from the adjoining township in order to fill out a fractional balance of the Asmond claim; this small triangle being in the extreme southwest corner of said township 8 S., R. 12 W. and bordering on the seashore, and which is numbered 21 on the new plat; but, owing to the size, shape, and peculiar location of this fractional piece of land so designated, it is manifestly impossible, under the rules which shall be referred to at a subsequent place in this opinion, that the said wedge-shaped fraction could have been within the intention of any of the parties under any of the many deeds which have been produced in evidence in this case. All the parties to this litigation seem correctly to have wholly disregarded this small wedge-shaped triangle, and it has not been mentioned either in the course of the trial or in the argument.

But some question did run through the trial by way of objection on the part of appellees to the several deeds introduced by appellant, because these deeds, all of them, except in the last few years, described the lots here in litigation as being in section 21, whereas by the last and final government plat there is no section 21 in this township that could possibly be applicable. See Goff v. Avent, 122 Miss. 86, 98, 84 So. 134; Id., 129 Miss. 782, 794, 93 So. 193; Weston Lumber Co. v. Strahan, 128 Miss. 54, 90 So. 452; Lott v. Rouse, 147 Miss. 802, 111 So. 838. If this objection were sustainable, or should be sustained, then the bill might have to be dismissed at the threshold, for there is no title by adverse possession, and the foundation deeds in the chain of title upon which complainant appellant stands would place

his lot as being in section 21 of said township and range when, as already said, according to the final government plat, there is no such section in that township which could possibly apply to the lands described in these deeds, or else the said section 21 would have to be rejected and the complainant left to stand on the remaining items of the description, Ladnier v. Cuevas, 138 Miss. 502, 103 So. 217; Pegram v. Newman, 54 Miss. 612, to do which would embarrass the case of both parties on the merits, and would endanger the future marketability of their respective titles.

But we do not think the point of objection was well taken, because all these lots are described as being bounded south by the Gulf of Mexico and on the north by the Louisville & Nashville Railroad, both of which permanent and monumental physical locations are shown on the surveyors' maps here in evidence. The location of these two permanent boundaries are not in any way disputed; and, it being clear that these two controlling monuments are not, and cannot be for all these associated and contiguously connected lots, in any section 21 of this township, according to the new plat of the township, it is thus made certain that the section 21 referred to in these deeds is section 21 of the original 1822 survey, and that all of these deeds have simply followed the original section descriptions, as used in the older deeds before the plat of 1849 was made. It was not held in the line of cases first cited supra that it is not allowable to describe lands according to the original or older survey, if it should appear by what is in the deed itself that the said original survey was the one referred to. When there is that in a deed, either on its face at large or by dependable reference therein, which shows that a particular earlier survey, or even that a survey made by others than government surveyors, was intended, this would be good under the principle that "that will be considered certain

which can be made certain." It is only when there is nothing in the deed sufficient to show that a different survey was referred to, that the last or final official government survey and plat is conclusively presumed to have been in mind.

It is the duty of courts in construing deeds to effectuate the intention of the parties, but, since deeds must be in writing, the intention must be found in the writing either by way of complete delineation of the description on the face of the deed or by dependable references therein made which, when applied, render the delineation complete. The sundry rules that have been formulated by the courts for the interpretation of descriptions are but aids in arriving at the probable true intention of the written instrument. These rules, so far as applicable to this case, may be summarized thus: In construing a deed, (1) effect must be given, if possible, to each item of the written contents and no item included in the deed as a part of the description is to be rejected as erroneous, or shall be varied, so long as it is reasonably possible to make all of them harmonize; and (2) those parts which are the more certain and dependable as descriptive items will interpret those items which are the less certain and dependable, and, when it is necessary in order to satisfy and harmonize all items, the more certain will, if reasonably possible, draw to themselves those that are the less certain; and (3) if any item is to be rejected as impossible, or varied as erroneous, the item which is the less certain and about which it is the more probable the grantor was mistaken will be thus rejected or varied.

Following upon the foregoing summary, and as a resume, we find that there are three conjoint and absolutely certain and dependable features which are disclosed by the three deeds to the three lots here brought into review: (1) There is the Gulf on the south; and (2) the railroad on the north of these lots; and (3) their com-

bined width is not less than one thousand four hundred sixty-seven feet measuring directly east and west. These facts are derived from the face of the deeds themselves, deeds executed by the same grantor, and all the parties to this case agree upon the facts as just stated. But these facts are impossible of fulfillment under section 21 of the new plat, but all are present, and can be fulfilled and satisfied and harmonized under section 21 of the old survey; wherefore the said certain and undisputed items drawn to themselves the said section 21 of the old survey as being the one to which reference is had, and as the only one to which reference could reasonably have been had, in all these several foundation deeds.

With this preliminary question determined, the merits may be satisfactorily reached, although involved in a considerable mass of related deeds and other pertinent data. The seashore line of the Gulf at this point is on a general eastward and westward course, but slightly north of east. The railroad which has existed there for approximately sixty years runs practically parallel with the shore line and at a present distance therefrom of approximately two thousand five hundred feet. The railroad runs east twenty degrees north. All the deeds reasonably construed would seem to have reference, in respect to their measurements eastwardly and westwardly, to the general course of the shore line, and to the approximately corresponding course of the railroad on the rear of the lots. The original owner, or the common source of title, was C. H. Hiern.

(a) On December 2, 1890, Hiern, conveyed to M. G. May a strip of land "beginning on the seashore of the Gulf of Mexico at the southeast corner of a certain tract conveyed to John J. Gribble on May 27, 1884, thence north with the east line of said tract to the right of way of the Louisville & Nashville Railroad, thence east along said right of way four hundred feet, thence south in a

course parallel with the first line to the seashore, and thence in a westerly direction along the seashore to the point of beginning, in section 21 township 8, range 12.''

(b) In the following year, and on September 14, 1891, said Hiern conveyed to Gribble, the predecessor in title of appellees, a strip of land described as ''commencing on the Gulf of Mexico five hundred fifty feet east of the eastern boundary line of land now owned by M. G. May and running thence eastwardly along said Gulf six hundred fifty-eight feet, thence north to the Louisville & Nashville Railroad; thence west along said right of way of said railroad six hundred fifty-eight feet, thence south to the place of beginning, said land being in section 21, township 8 S., R. 12 W.''

(c) And on May 23, 1892, the said Hiern conveyed to Michel, the predecessor in title of appellant, a strip described as ''commencing on the Gulf of Mexico at the southeast corner of a lot sold to M. G. May and running eastwardly along said Gulf five hundred fifty feet to the western boundary of a lot sold to Gribble, thence north with said western boundary of Gribble's land to the right of way of the L. & N. R. R., thence westwardly with said right of way five hundred fifty feet to the land of May, thence south with the eastern boundary of May's land to the Gulf and to the beginning point.''

Just what was the location of the western and eastern lines of the May property at the time of the three conveyances above set out, and particularly what was the exact location of the southeast corner thereof, is the question that primarily is in dispute in this case. To accept the southeast corner of the May lot as same has been generally accepted for, say, the last fifteen or twenty years, would shorten the distance of five hundred fifty feet plus six hundred fifty-eight feet declared in the second or Gribble deed, above mentioned, by approximately thirty-five feet, according to one view, and by

about forty-nine feet according to another, when measured along the shore line, and would thus narrow appellant's middle lot by that much, unless he can take the shortage from appellees' lot, and that is the ultimate issue here presented.

These conveyances were made now nearly forty years ago. No monument, natural or artificial, within the section, is referred to in the deeds in such a way in respect to the east or west lines as to dependably affix them to anything now in existence and which may be seized upon as indicating exactly where the said southeast corner of the May lot was located on the ground at that remote time. There is an old fence on a line now claimed to be the west line of the May lot, and there are stakes and the like on the ground, and there are those who by repute or tradition attempt to point out the said southeast corner of the May lot by close approximation, but none have testified who say when and by whom this fence or these stakes were placed or who assert any real knowledge of what was the actual situation at the time these deeds were made.

From these features, thus in some doubt, we turn to the lot conveyed to appellees' predecessor in title, that is, to the second deed above mentioned; the said deed being the prior in time and therefore the superior in right as between the parties in this suit. According to the contention of appellees, the said second, or Gribble, deed carried the eastern line of the lot therein conveyed to the east side or eastern section line of said section 21; while it is the contention of appellant that the measurements in this Gribble deed would carry that lot not only to said section line, but several feet beyond it. There are no circumstances shown by the record which would justify a conclusion that there was any intention to extend the lot to the eastward beyond section 21, and the deed itself limits the lot as being within said section 21. The in-

ference is the more probable, if not unavoidable, taking all the related conveyances shown in the record and the entire history of these transactions into view, that Hïern, the grantor, in the said second deed intended thereby to convey to Gribble up to said eastern section line of section 21. This eastern section line was established and marked on the ground by the government surveyors more than one hundred years ago. This section line is not, and has never been, in dispute, and the surveyors who testified in this case agree on its location and that it corresponds as now traced on the ground with the original field notes which describe it.

This, therefore, gives to the lot conveyed by said superior second deed, the deed upon which appellees stand, the eastern, the southern, and the northern boundaries definitely and unmistakably fixed upon the ground. And the deed by its express terms conveys a strip six hundred fifty-eight feet wide measured eastwardly and westwardly along the shore line on the south and the railroad on the north, which as shown by the testimony is six hundred twenty-six feet directly at right angles east and west. This exactly is all that appellees are claiming and of which they have taken possession as the successor in title to Gribble; and, as already said, Gribble's deed, being a year older than the deed to appellant's predecessor in title, must prevail over the latter.

In order to displace and trench upon the eastward and westward contents of appellees' lot in a portion of the six hundred fifty-eight feet in width along the shore line, or six hundred twenty-six feet at right angles, the measurement of five hundred fifty feet as and for the starting point must be shown to be the more certain or more accurate than the inside measurement of the six hundred fifty-eight feet. There is nothing in the evidence or in the record which preponderates in favor of that conclusion, leaving aside the frequently applied rule

that, where there is error in one of two items in a description, so that uncertainty is thereby produced, that will be accepted as correct, which, if reasonable, is the more favorable to the grantee. While as a general proposition the calls in distance and course for a starting point are controlling, nevertheless the true rule is that, when the succeeding calls are as readily ascertained and are as little liable to mistake, they are of equal dignity with, and may control, the first, 9 C. J. 164; Hubbard v. Whitehead, 221 Mo. 672, 682, 683, 121 S. W. 69, and cases therein cited. Moreover, as already indicated, appellant would have to show by such strength of proof as to overturn one or both the measurements aforesaid, that the point now taken by the surveyors, who testified in behalf of appellant in this case, as the southeast corner of the May lot, was the identical point which was in the eyes of the parties when Hiern's deed to Gribble in 1891 was executed.

The case thus is that, in order to show that appellees' width of six hundred fifty-eight feet along the shore line is incorrect, appellant must show (a) that the present fence line on the west of May's lot is correctly located according to the actual situation and the understanding of the parties forty years ago; and (b) that there was no error made then in the measurement of May's lot of four hundred feet; and (c) that there was no error in the measurement of the five hundred fifty feet between the May lot and the lot of appellees. There are thus three chances of error which appellant must overcome, whereas there is only one chance that appellees' measurement of six hundred fifty-eight feet was an error. We cannot say that the chancellor was manifestly wrong in his conclusions upon these issues of fact; from which it follows that the decree must be affirmed.

Affirmed.